IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION

**GARY GROENEWEG,**

    Plaintiff,

  v.

**JELD-WEN, INC.,**

    Defendant.

No. 6:20-cv-01030-AA

**OPINION & ORDER**

AIKEN, District Judge.

This case comes before the Court on Defendant's Motion for Summary Judgment. ECF No. 41. The Court concludes that this matter is appropriate for resolution without oral argument and the motion is GRANTED.

## LEGAL STANDARD

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, affidavits, and admissions on file, if any, show "that there is no genuine dispute as to any material fact and the [moving party] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Substantive law on an issue determines the materiality of a fact. *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987). Whether the evidence is such that a reasonable jury could return a verdict for the nonmoving party determines the authenticity of the dispute. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The moving party has the burden of establishing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party shows the absence of a genuine issue of material fact, the nonmoving party must go beyond the pleadings and identify facts which show a genuine issue for trial. *Id.* at 324.

Special rules of construction apply when evaluating a summary judgment motion: (1) all reasonable doubts as to the existence of genuine issues of material fact should be resolved against the moving party; and (2) all inferences to be drawn from the underlying facts must be viewed in the light most favorable to the nonmoving party. *T.W. Elec.*, 809 F.2d at 630-31.

## BACKGROUND

Plaintiff Gary Groeneweg is an employee of Crete Carrier ("Crete"). Sieving Decl. Ex. A, at 4. ECF No. 42. Plaintiff began working for Crete in 2016 and his position was "national driver," meaning that he transported loads across the 48 contiguous states. *Id.* At the relevant time, Plaintiff had twelve years of experience as a truck driver. *Id.* at 4-5.

Defendant JELD-WEN is a Delaware corporation authorized to do business in Oregon. Ans. ¶ 2. ECF No. 23. Defendant is a manufacturer of doors and windows. *Id.* In May 2018, there was a Transportation Agreement that governed the relationship between Crete and Defendant. Sieving Decl. Ex. B, at 3-4; 18-22. The Transportation Agreement contained the terms and reciprocal responsibilities of Defendant as shipper and Crete as carrier. *Id.*

On April 27, 2018, Crete assigned Plaintiff to pick up a load of windows from Defendant's facility in Bend, Oregon. Sieving Decl. Ex. A, at 16-17. The windows were to be delivered to Professional Builders Supply ("PB Supply") in Charlotte, North Carolina. Crete's assignment directed that Plaintiff would not be involved in loading the trailer but that he was to assist in unloading the trailer at its destination. *Id.* at 17.

Both the truck and the trailer involved in the shipment were owned by Crete. Sieving Decl. Ex. A, at 15. As part of Plaintiff's assignment, Crete told Plaintiff where his initial stop would be and where all the subsequent stops would be on his assignment. *Id.* at 18. Crete ordered Plaintiff to place an enforcer lock on to the trailer before leaving Defendant's facility, in addition to the seals provided by Defendant. *Id.* at 20.

Plaintiff arrived at Defendant's facility in Bend at 8:22 a.m. on April 28, 2018. Sieving Decl. Ex. A, at 21. Plaintiff proceeded to the driver's entrance and signed for the load. *Id.* at 35-36. Plaintiff did not speak to any of Defendant's personnel about the load. *Id.* Plaintiff received a packet of material which included seals for the trailer, the bill of lading, the packing slip, and the routing, as well as form for the customer to grade the driver's performance. Wylie Decl. Ex. 1, at 9-10. ECF No. 47. The form included questions for the customer about how the driver performed, including performance in unloading. Wylie Decl. Ex. 2, at 10-11. The packet included a written instruction to Plaintiff that he was to assist in unloading the trailer, in line

with the instructions Plaintiff had already received from Crete. Sieving Decl. Ex. A, at 37-38.

The windows were loaded into the trailer by Defendant's employees and secured to the exterior wall of the trailer by a pair of ratchet straps. Sieving Decl. Ex. A, at 8-9; Wylie Decl. Ex. 1, at 22. Defendant employs a load supervisor who inspects each row of windows as they are loaded to ensure that they are loaded safely. Sieving Decl. Ex. B, at 14. Defendant's employees will also use "pogo" or ratchet straps to hold the windows during loading, but the windows are secured before the trailer departs. Sieving Decl. Ex. B, at 16-17. However, "pogos" are a specialized piece of equipment that goes with the trailer and Defendant does not have its own pogos to use when loading trailers. Supp. Sieving Decl. Ex. K, at 2-3. ECF No. 49.

Employees of PB Supply testified that the stacking method used by Defendant was "the most efficient way" to load trailer and that they see it "from time to time," but that they did not prefer it because of the difficulty of unloading heavy windows from the trailer "without damaging it and without anyone being hurt." Wylie Decl. Ex. 2, at 5. Another PB Supply employee testified that the stacking method used by Defendant was common. Wylie Decl. Ex. 3, at 3.

Plaintiff was not involved in loading the windows on to the trailer. Sieving Decl. Ex. A, at 11-12. However, Plaintiff did inspect the load to make sure the windows were secured to the wall so that they would not shift during transport. *Id.* at 12. Plaintiff's inspection involved climbing into the trailer and making sure the windows were strapped and secure. *Id.* Once this inspection was complete, Plaintiff

closed the trailer and sealed it with an "enforcer lock." *Id.* Crete requires all loads to be secured with such a lock. *Id.* Plaintiff also placed the seal provided by Defendant on the back of the trailer. Wylie Decl. Ex. 1, at 12.

Plaintiff drove the windows directly from Defendant's facility in Bend, Oregon to PB Supply in Charlotte, North Carolina. Sieving Decl. Ex. A, at 6-7. Plaintiff did not open the trailer at any point during the trip because doing so would have broken the seal and any missing product would have been Crete's responsibility. Wylie Decl. Ex. 1, at 12-13. Plaintiff arrived in Charlotte on May 3, 2018. Sieving Decl. Ex. A, at 24.

Crete policies on loading and unloading allow drivers to hire a worker, called a "lumper," to aide them in unloading trailers. Sieving Decl. Ex. A, at 32-33. Plaintiff testified at his deposition that he has hired a lumper in the past, with authorization from Crete. *Id.* at 33. No lumper was hired for the delivery from Bend to Charlotte. *Id.* at 34.

When Plaintiff opened the trailer in North Carolina, the windows were still secured by the straps. Sieving Decl. Ex. A, at 6. Plaintiff removed the straps and, together with the employees of PB Supply, Plaintiff began unloading the windows from the trailer. *Id.* During unloading, the PB Supply employees would take the windows off of the trailer and Plaintiff tried "to hold the stack, you know, if it shifts." *Id.* at 25. Plaintiff also helped carry the heavier windows out of the trailer. *Id.* During the unloading process, Plaintiff was holding on two of the windows, one balanced atop the other, when the whole stack shifted, struck Plaintiff on the head,

and knocked Plaintiff to the ground. *Id.* at 6. When the windows fell on Plaintiff, none of the PB Supply employees were with Plaintiff in the trailer. *Id.* at 26. Plaintiff was caught beneath the windows. Sieving Decl. Ex. D, at 9. The PB Supply employees returned and extricated Plaintiff from the fallen windows. Sieving Decl. Ex. C, at 3. While the PB Supply employees were removing the windows from on top of Plaintiff, another window fell on him. Sieving Decl. Ex. D, at 8-9. The trailer was partially unloaded at the time the windows fell on Plaintiff. Sieving Decl. Ex. A, at 9. A PB Supply employee testified that incidents where windows fall on people during unloading are not unknown but are not common. Wylie Decl. Ex. 3, at 11.

Plaintiff was injured by the falling windows and was transported to the hospital. Sieving Decl. Ex. A, at 27. Plaintiff was diagnosed with a broken neck and a laceration to his head and was discharged on May 4, 2018. *Id.* at 30.

Approximately six months prior to the incident in North Carolina, Plaintiff had been involved in another delivery of JELD-WEN windows, this time to Colorado, when Plaintiff slipped and the windows fell on Plaintiff during unloading. Sieving Decl. Ex. A, at 22-23, 28-29. Plaintiff was injured in that incident and filed a workers compensation claim. *Id.* at 29.

## DISCUSSION

Following the Court's ruling on Defendant's Motion to Dismiss, ECF No. 22, Plaintiff's remaining claims are: (1) common law negligence; (2) negligence *per se*; (3) Oregon Safe Employment Act ("OSEA") claims; and (4) claims under the Oregon Employer Liability Law ("ELL").

### I. Common Law Negligence

Plaintiff alleges that Defendant acted negligently by creating a situation in which Plaintiff's injuries were reasonably foreseeable. "Traditionally, the elements of common-law negligence required a plaintiff to plead and prove that the defendant owed the plaintiff a duty, that the defendant breached that duty, and that the breach was the cause-in-fact of some legally cognizable damage to the plaintiff." *Chapman v. Mayfield*, 358 Or. 196, 205 (2015) (en banc) (internal quotation marks and citation omitted, alterations normalized). However, the Oregon Supreme Court established in *Fazzolari v. Portland Sch. Dist. No. 1J*, 303 Or. 1, 10 (1987), that the traditional duty-breach analysis for Oregon negligence would be subsumed under the concept of general foreseeability. *Chapman*, 358 Or. at 205.

> [U]nless the parties invoke a status, a relationship, or a particular standard of conduct that creates, defines, or limits the defendant's duty, the issue of liability for harm actually resulting from defendant's conduct properly depends on whether that conduct unreasonably created a foreseeable risk to a protected interest of the kind of harm that befell the plaintiff.

*Fazzolari*, 303 Or. at 17.

Under *Fazzolari* there are exceptions to the general rule where the duty element is not subsumed into the foreseeability analysis and "the nature and scope of the duty owed by the defendant to the plaintiff can be created, defined, or limited based on, among other things, the relationship between or status of the parties." *Towe v. Sacagawea, Inc.*, 357 Or. 74, 86 (2015).

Here, Defendant asserts that such a special relationship exists because Defendant hired Crete, Plaintiff's employer, to transport and unload the windows.

Page 7 – OPINION & ORDER

An "arm's-length contractual relationship between the parties does not transform that relationship in to a 'special one,'" and that determination is instead "based on function, rather than form, and depends not on the words that the parties choose to describe their dealings but on the role that each plays." *Abraham v. T. Henry Const., Inc.*, 230 Or. App. 564, 572 (2009). In such a contractor situation, a defendant will not be held liable

> (1) when the risk is obvious and inextricably intertwined with the plaintiff's employer's performance of a specialized task; (2) the defendant lacks expertise regarding and control over the specialized task and, consequently, the risk; and (3) the defendant hired the plaintiff's employer because of its expertise in that work[.]

*Spain v. Jones*, 257 Or. App. 777, 787-88 (2013).

Here, the risk presented by unloading the windows was obvious, as the evidence demonstrates that accidents during the unloading process are far from unknown. Wylie Decl. Ex. 2, at 7-8. Plaintiff was an experienced driver and had personally been injured in a previous incident during the delivery of JELD-WEN windows. In addition, Plaintiff inspected the windows after they were loaded on to the trailer at Defendant's facility. On this record, the Court concludes that the risk was obvious.

That risk is also intertwined with the specialized task Crete, and by extension Plaintiff, were hired to perform—transporting and unloading windows. *See* Sieving Decl. Ex. A, at 17 (Plaintiff testified that he received instructions from Crete to assist in unloading the trailer at its destination). Crete had written policies for "touch loads," where the driver was required to assist in unloading trailers, including

providing the option of hiring a lumper to assist in the unloading process. Sieving Decl. Ex. A, at 31-32, 39-40. On this record, the evidence is clear that unloading was part of the specialized services offered by Crete.

On the second issue, the record demonstrates that Defendant did not control how Crete, or Plaintiff, transported or unloaded the trailer. The trailer itself belonged to Crete and the decision on whether to install additional safety devices, such as pogos, was left to Crete. After Plaintiff inspected the load and attached his enforcer lock, Defendant had no access to the contents of the trailer. Once the trailer arrived at its destination in North Carolina, Defendant had no control over how the trailer would be unloaded. Those decisions, including whether to hire a lumper, and how the individual windows would be removed from the trailer were entirely in the control of Crete, Plaintiff, and the PB Supply employees. In essence, Defendant loaded the trailer, gave Crete a destination, and then entrusted the matter to Crete and Plaintiff.

Finally, Defendant is a manufacturer of doors and windows. It is not in business of transporting or unloading trailers. Defendant hired Crete, a shipping company, to perform those specialized tasks instead.

On this record, the Court concludes that a special relationship existed between Defendant and Plaintiff's employer that relieves Defendant of its duty to Plaintiff and will preclude Defendant from being held liable for Plaintiff's injury under a negligence theory. Defendant's motion for summary judgment is granted as to

Plaintiff's common law negligence claim and the Court need not reach Defendant's arguments in the alternative on that claim.

## II. Negligence *Per Se* and OSEA

Plaintiff alleges that Defendant was negligent *per se* because Defendant violated the OSEA. In addition, Plaintiff alleges that he is entitled to relief under the OSEA and under the Oregon Administrative Rules ("OAR").

The standards for a claim of negligence *per se* and statutory liability are the same: a plaintiff "must allege that (1) defendants violated a statute; (2) that plaintiff was injured as a result of that violation; (3) that plaintiff was a member of the class of persons meant to be protected by the statue; and (4) that the injury plaintiff suffered is of a type that the statute was enacted to prevent." *McAlpine v. Multnomah Cnty.*, 131 Or. App. 136, 144 (1994); *see also George v. Myers*, 169 Or. App. 472, 478 (2000) (clarifying that, in the OSEA context, the "statute" defendants must have violated is "the OSEA safety regulations.").

The Oregon Court of Appeals has held that "noncompliance with the OSEA cannot be the basis for a negligence *per se* claim against an indirect employer." *George*, 169 Or. App. at 478. However, the OSEA applies not only to employers, but also to "owners." ORS 654.022. The statute defines an "owner" as "every person having ownership, control, or custody of any place of employment or of the construction, repair or maintenance of any place of employment." ORS 654.005(6). Oregon courts have held that OSEA regulations may establish the standard of care in a negligence claim against an "owner." *See Moe v. Beck*, 100 Or. App. 177, 179 n.2

(1990) (en banc). "Thus, at least in some circumstances, ownership of a premises where OSEA violations occur is sufficient to support negligence *per se* liability even if the defendant had no direct involvement in, or control over, the injury producing activity." *Brown v. Boise-Cascade Corp.*, 150 Or. App. 391, 407 (1997). The Oregon Court of Appeals explained that a "defendant owner is liable only if the regulation whose violation underlies the OSEA claim is one that either explicitly, or by nature, imposes obligations on owner of premises." *Id.* at 408. For example, the court noted that regulations "which pertain to work practices or methods, as opposed to requirements pertaining to workplace structures or safeguards, may not apply to owners." *Id.*

Here, the record establishes that Defendant did not own or control the trailer, which belonged to Crete. Sieving Decl. Ex. A, at 15. Once Plaintiff inspected, sealed, and locked the trailer, Defendant had no control or custody over the contents of the trailer. Crete and Plaintiff had custody and control of the trailer and its contents during the trip across the country. Defendant did not own the windows, which belonged to PB Supply. Nor did Defendant control the unloading of the trailer, which was the responsibility of Crete, Plaintiff, and PB Supply. In addition, Plaintiff was not injured until he and the PB Supply employees had removed the straps securing the windows to the walls of the trailer and began removing the windows from the trailer. On this record, the Court concludes that Defendant was not an "owner" for purposes of liability under the OSEA or a theory of negligence *per se*. Defendant is therefore entitled to summary judgment on this claim.

### III.   ELL

Finally, the Court turns to Plaintiff's claim under Oregon's Employers' Liability Law. The ELL provides:

> Generally, all owners, contractors or subcontractors and other persons having charge of, or responsibility for, any work involving a risk or danger to the employees or the public shall use every device, care and precaution that is practicable to use for the protection and safety of life and limb, limited only by the necessity for preserving the efficiency of the structure, machine or other apparatus or device, and without regard to the additional cost of suitable material or safety appliance and devices.

ORS 654.305.

The ELL can serve as a basis of a claim against an indirect employer when the defendant is "in charge of or [has] responsibility for work involving risk or danger in either (a) a situation where defendant and plaintiff's employer are simultaneously engaged in carrying out work on a common enterprise, or (b) a situation in which the defendant retains a right to control or actually exercises control as to the manner or method in which the risk producing activity is performed." *Miller v. Georgia-Pacific Corp.*, 294 Or. 750, 754 (1983) (en banc).

The "common enterprise" test requires (1) "that two employers (the plaintiff's actual employer and a third-party defendant employer) participate in a project of which the defendant employer's operations are an 'integral' or 'component' part,"; (2) the work must involve a risk or danger to the employees or the public, (3) the plaintiff must be an "employee" of the defendant employer; and (4) the defendant "must have charge or responsibility for the activity or instrumentality that causes the plaintiff's injury." *Sacher v. Bohemia, Inc.*, 302 Or. 477, 486-87 (1987). To be considered an

"employee" for the third element, the employee must be (1) an "adopted" employee; (2) an "intermingled" employee; or (3) an employee of an independent contractor hired by defendant where the defendant retains or exercises a right to control the risk-creating activity or instrumentality. *Id.* at 486.

> In short, the common enterprise category applies in circumstances where both employees of the defendant and employees of the direct employer have intermingled duties and responsibilities in performing the risk-creating activity or where equipment that the defendant controls is used in performing that activity.

*Yeatts v. Whitman v. Polygon Nw. Co.*, 360 Or. 170, 180 (2016).

However, Oregon courts do not construe the ELL "to impose a duty upon each employer, engaged in a common enterprise with another, to make safe the equipment and method of work of the other, even though both have a measure of control over the activity in which they are jointly engaged." *Brown*, 150 Or. App. at 397 (internal quotation marks and citation omitted). "The injury must result by virtue of the commingling of the activities of the two employers and not be solely attributable to the activities or failures of the injured workman's employer." *Id.* (internal quotation marks and citation omitted).

Read in the light most favorable to Plaintiff, the Court concludes that Defendant and Crete were jointly participating in a project—delivering windows to PB Supply—in which Defendant's loading of the windows into the trailer was an integral or component part. The Court further concludes that the joint project involved a risk of danger to employees. The success of the "common enterprise" test will therefore turn on whether Plaintiff was an "employee" of Defendant and on

whether Defendant had charge of or responsibility for the instrumentality of Plaintiff's injury.

The Court will first consider whether Defendant had charge of or responsibility for the instrumentality of Plaintiff's injury. It is undisputed that Defendant loaded the trailer and that the trailer was sealed from the time it left Defendant's facility in Oregon until it arrived at PB Supply's facility in North Carolina. It is also undisputed that the windows did not shift in transit. The unloading process was carried out by Plaintiff and PB Supply and no direct employees of Defendant were present. Defendant did not instruct Plaintiff on how to unload the truck, nor was Plaintiff's injury caused by a failure of Defendant's equipment. Plaintiff's injury did not occur until after (1) Plaintiff removed the straps holding the stack of windows in place and (2) Plaintiff was left to hold the stack of windows off the wall of the trailer by himself. Sieving Decl. Ex. A, at 6; Supp. Sieving Decl. Ex. M, at 4. The Court concludes that, even assuming that Plaintiff was an adopted or intermingled employee of Defendant, Defendant's lack of control over how the risk-producing activity prevents liability under a "common enterprise" theory.

The second test under which an indirect employer may be held liable is the "right to control" test. To be liable, the defendant "must have exercised or retained a right to control the *manner or method in which the risk-producing activity was performed.*" *Quakenbush v. Portland General Elec. Co.*, 134 Or. App. 111, 116 (1995) (emphasis in original). Courts must (1) identify the work involving risk or danger over which the indirect employer must have retained a right of control and (2)

determine whether the defendant retained the right control the risk-producing activity though "some source of legal authority for that perceived right" or through "evidence from which a retained right to control can be inferred." *Sanford v. Hampton Resources, Inc.*, 298 Or. App. 555, 572-73 (2019).

Here, the first factor is straightforward. The work involving risk or danger is the unloading of the trailer. With respect to the second factor, there is no evidence that Defendant had the legal right to control the unloading process or that they retained that right or power to do so. Rather, the evidence is that decisions concerning how the windows would be unloaded from the trailer were made by the employees of PB Supply and by Crete, through Plaintiff. The Court concludes that Defendant did not control or have a right to control the manner or method by which the trailer was unloaded.

Accordingly, the Court concludes that Defendant is entitled to summary judgment on Plaintiff's ELL claim.

## CONCLUSION

For the reasons set forth above, Defendants' Motion for Summary Judgment, ECF No. 41, is GRANTED and this case is DISMISSED. Final judgment shall be entered accordingly.

It is so ORDERED and DATED this  7th  day of August 2023

                                        /s/Ann Aiken
                                        ANN AIKEN
                                        United States District Judge